UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC PIPPEN, #345056,

                Petitioner,

                                    CASE NO. 2:11-CV-13980
v.                                  HONORABLE MARIANNE O. BATTANI

CINDI CURTIN,

                Respondent.

_____/

**OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF
HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY,
AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

**I.**    **Introduction**

This is a habeas case brought pursuant to 28 U.S.C. § 2254.  Michigan prisoner Eric

Pippen ("Petitioner") was convicted of one count of second-degree murder, MICH. COMP.

LAWS § 750.317, felon in possession of a firearm, MICH. COMP. LAWS § 750.224f, and

possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b,

following a jury trial in the Wayne County Circuit Court.  He was sentenced as a third

habitual offender, MICH. COMP. LAWS § 769.11, to 50 to 75 years imprisonment on the

murder conviction, a concurrent term of two to five years imprisonment on the felon in

possession conviction, and a consecutive term of two years imprisonment on the felony

firearm conviction in 2008.

In his pleadings, Petitioner raises claims concerning the admission of other acts

evidence, a defense witness's appearance in prison garb, the conduct of the prosecutor,

and the sufficiency of the evidence.  For the reasons set forth, the Court denies the petition

for a writ of habeas corpus.  The Court also denies a certificate of appealability and denies leave to proceed in forma pauperis on appeal.

## II.   **Facts and Procedural History**

Petitioner's convictions arise from the shooting death of Derrick Hill in the Brewster Projects in Detroit, Michigan on March 5, 2006.  The Michigan Court of Appeals set forth the basic facts of the crime, which are presumed correct on federal habeas review, 28 U.S.C. § 2254(e)(1); Wagner v. Smith, 581 F.3d 410, 413 (6th Cir. 2009), as follows:

> Defendant's convictions arose from the shooting death of Derrick Hill. On March 5, 2006, while standing outside the Brewster Projects in Detroit, Hill was shot in the head. Minutes before Hill was shot, Andre Johnson saw Hill talking with defendant and Steven Anderson. After Hill was shot, Johnson observed defendant running away with a gun in his hand.

People v. Pippen, No. 286325, 2000 WL 3837419, *1 (Mich. Ct. App. Nov. 17, 2009) (unpublished).

The Court further adopts Petitioner's summary of the trial testimony to the extent that it is consistent with the state court record.  That summary is as follows:

> Mr. [Andre] Johnson testified that on March 5, 2006 at around 6:30 PM, he was in the area of 2700 St. Antoine, in the City of Detroit, otherwise known as the Brewster Projects. (Vol. III, pg. 21). Mr. Johnson indicated that he had seen both the Defendant and Mr. Derrick Hill, (hereafter referred to as "the decedent") around that time, standing outside in an open area in the Brewster Projects. (Vol. III, pgs. 22-23).
>
> Mr. Johnson testified that he could not remember with certainty any of the events of that night, or if he had made specific statements to the police and taken down by Detective Fisher which were read into the record (Vol. III, pgs. 41-47). He further indicated, that he could not remember making statements during an investigative subpoena regarding the shooting of the decedent on March 5, 2006 (Vol. III, pgs. 49- 73), but that he "somewhat" remembered making certain statements regarding this incident or did not remember making other statements in a Preliminary Exam for Mr. Steven Anderson, a co-defendant of the Defendant in this case, on March 29, 2006 in the 36th District Court. (Vol. III, pgs. 77-106, 109-113). Mr. Johnson continued these

answers when he was asked if he had made statements during the preliminary examination of the Defendant, indicating that he could not remember if he had made specific statements being read to him by the Prosecutor. (Vol. III, pg. 122-163, 164-176, Vol. IV, pgs. 7-36).[1] Mr. Johnson did acknowledge however, that he was driving his sister's car that night and that he drove the decedent to the hospital after the decedent had been shot. (Vol. III, pg. 46).

On cross-examination, defense counsel read from the Investigative Subpoena a statement in which Mr. Johnson stated that he "didn't see who did the shooting." (Vol. IV, pg. 39). Mr. Johnson further admitted that he was writted out of Jackson Prison to fulfill the investigative subpoena and was only told he was going to be given a "deposition" when he arrived at the Wayne County Prosecutor's Office and that he did not willingly give his deposition. (Vol. IV, pgs. 41-43). Mr. Johnson then invoked his Fifth Amendment right not testify. (Vol. IV, pg. 88).

Ms. Jessica Leonard, the cousin of the decedent, testified that she identified the remains of the decedent at the Wayne County Medical Examiner's Office. (Vol. IV, pg. 50).

Ms. Charlotte Matthews testified that on March 5, 2006, she was sitting in a car with some friends in the area of 2700 St. Antoine in the City of Detroit, otherwise known as the Brewster Projects. (Vol. IV, pgs. 51-52). Ms. Matthews indicated that she had seen the Defendant in the same area on March 5, 2006 (Vol. IV, pg. 53) and that he was with three other individuals, Steven Anderson, Capri Tolliver and "Chunk." (Vol. IV, pgs. 54-55). She further stated that she had also seen the decedent that day, and that he was with Mr. Johnson. (Vol. IV, pg. 56).

Ms. Matthews testified that she knew that the Defendant and his friends had problems with the decedent and Mr. Johnson. (Vol. IV, pg. 58). She also indicated that after she and her friends drove to the other side of the parking lot, she heard a gunshot, (Vol. IV, pg. 59) at which time she saw everybody who had been outside in the area running away from where the shot was fired, including the Defendant (Vol. IV, pgs. 60-61).

Officer Raytheon Martin, of the Detroit Police Department, testified that on March 5, 2006 at around 6:30 PM, he was called out to 2700 St. Antoine, in

---

[1]Andre Johnson's preliminary examination testimony was read into the record. That testimony indicated that Johnson saw the victim talking with Petitioner and another man just before the shooting and that Johnson saw Petitioner fleeing the scene with a gun in his hand after the shooting.

the City of Detroit to respond to an assault and battery which had occurred. (Vol. IV, pgs. 67-68). Upon arriving at the scene, Officer Martin observed a puddle of blood as well as a forty caliber shell casing; however, he did not come across any injured person at that time. (Vol. IV, pg. 69). Officer Martin then called both Detroit Receiving Hospital and Henry Ford to check for a possible shooting or stabbing victim at either hospital, and was informed that such a victim had been brought to Detroit Receiving. (Vol. IV, pg. 69). Officer Martin indicated that there was a medium crowd of people at the scene when he arrived and that he made contact with an individual there and took information. (Vol. IV, pgs. 71-72).

Dr. Leigh Hlavety, an Assistant Medical Examiner at the Wayne County Medical Examiner's Office, testified that on March 6, 2006, she performed an autopsy on the decedent. (Vol. IV, pg. 82). Dr. Hlavety testified that the decedent had an entrance gunshot wound to the head, behind his right ear. (Vol. IV, pg. 83). Dr. Hlavety further indicated that she recovered fragments of a bullet from the decedent's head, which she turned over to the Detroit Police Department. (Vol. IV, pgs. 83-84). Moreover, she found no evidence of close range firing on the skin surrounding the entrance wound. (Vol. IV, pg. 84). Lastly, Dr. Hlavety stated that the cause of death was a single gunshot wound to the head and that the manner of death was homicide. (Vol. IV, pgs. 85-86).

Mr. James Thomas [Jr.] testified that he had heard a conversation between the Defendant and Mr. Capri Tolliver in which it was stated that Mr. Tolliver and the Defendant were going to "knock off this guy that got out of the hospital and they didn't want to knock off Keisha, and Capri didn't want to knock off Keisha." (Vol. IV, pg. 111). Moreover, Mr. Thomas indicated that the Defendant and Mr. Tolliver were planning to do this because both people referred to in the conversation were witnesses to a crime the Defendant had committed. (Vol. IV, pg. 112). Mr. Thomas stated that the Defendant would repeatedly blame what happened on March 5, 2006 on Ms. Lakeshia White, and that he could not stand her. (Vol. V, pg. 71). He further indicated that Ms. White would often threaten the Defendant that she was going to call the police on him. (Vol. V, pg. 92). Mr. Thomas also testified that after he heard about Mr. Tolliver and Ms. White being killed, he called the Defendant seven or eight times but was unable to get a hold of him. (Vol. V, pgs. 74-75).

On cross examination, Mr. Thomas admitted that the Defendant did not say, "knock off" as it regarded Ms. White, but rather used the term "take care of." (Vol. V, pgs. 102, 104). Moreover, he indicated that Mr. Tolliver did not seem bothered at all when the Defendant allegedly stated that they needed "to take care of" Ms. White, Mr. Tolliver's girlfriend and mother to his unborn child. (Vol. V, pg. 116).

4

Ms. Sara Steiger, testified that on June 27, 2007 she was living at 14660 Winthrop Street, in the City of Detroit, with Mr. Capri Tolliver and Ms. Lakeshia White. (Vol. V, pgs. 12-13). Ms. Steiger indicated that she and Ms. White had gone out to a bar and upon returning to their home, observed the Defendant sitting in the house with Mr. Tolliver smoking a marijuana blunt. (Vol. V, pgs. 14-15). Ms. Steiger stated that the Defendant asked her to go upstairs and have sex with him, which she turned down, and that this request was funny, in that he had never hit on her before. (Vol. V, pg. 16).

Ms. Steiger further testified that a few minutes later, a man came in the house and shot Mr. Tolliver in the head, and then fired shots at both her and Ms. White. (Vol. V, pg. 17). She went into greater detail, explaining that the shooter pointed the gun at Mr. Tolliver's temple and shot him at close range. (Vol. V, pg. 18). She further explained that the shooter then shot Ms. White in the back, followed by his pointing the gun at her (Ms. Steiger) and shot her in the chest. (Vol. V. pg. 19). Ms. Steiger then ran out of the house, passing the Defendant, and at which time she heard one or two more gunshots. (Vol. V, pg. 20). Ms. Steiger stated that she then ran to her neighbor's house, and while waiting for her neighbor, she observed the Defendant and the shooter running away from the home in the same direction. (Vol. V, pgs. 21-22). She also indicated that the Defendant was sitting in the room, about eight feet away from the shooter, and that he did nothing. (Vol. V, pg. 19). Ms. Steiger did admit, however, that she has been convicted of a crime involving theft or dishonesty in the past ten years. (Vol. V, pg. 23).

On cross examination, Ms. Steiger admitted to having two shots of tequila at the bar she was at, before returning home. (Vol. V, pg. 24). She further admitted to also smoking marijuana laced with cocaine that night, (Vol. V, pg. 24) and that she might have also taken one or two hits from the marijuana blunt being smoked by Mr. Tolliver and the Defendant. (Vol. V, pg. 26). Furthermore, Ms. Steiger admitted that the Defendant moved out of the way to let her out of the house after she had been shot, which was contrary to what she had testified to earlier. (Vol. V, pg. 32).

Officer Velma Tutt, of the Detroit Police Departments Crime Scene Unit, testified that on March 5, 2006, she processed a crime scene at 2700 St. Antoine, in the City of Detroit, in an area commonly known as the Brewster Projects (Vol. V, pgs. 38-39). Officer Tutt indicated that she seized from the crime scene a Winchester Forty Smith and Wesson spent casing. (Vol. V, pg. 41). Officer Tutt further testified that she photographed the crime scene (Vol. V, pg. 42-43). On cross-examination, Officer Tutt admitted, however, that she could not connect any suspect or a defendant definitively with the spent shell casing found at the scene. (Vol. V, pg. 45).

Ms. Latrisha White testified that on March 5, 2006, she was inside a van

5

parked in a parking lot within the area of 2700 St. Antoine, in the City of
Detroit, otherwise known as the Brewster Projects. (Vol. V, pgs. 48-49). Ms.
White indicated that she observed several men in the courtyard area, two of
which she identified as the Defendant and Mr. Anderson. (Vol. V, pg. 49).
She also indicated however, that she was asleep in the van while it was
parked at the Brewster Projects and that she was awaken by a gunshot. (Vol.
V, pgs. 50-51).

Ms. White indicated that following the shooting, she had a conversation with
her sister, Ms. Lakeshia White, in which she told her sister that she saw the
decedent get shot and asked her sister if the Defendant had shot the
decedent. (Vol. V, pgs. 52-53).

On cross-examination, Ms. White admitted that she was far away from where
the shooting took place and that her view was obstructed by a building, traffic
and iron gates which surround the building. (Vol. V, pg. 61). She further
admitted that she did not see who did the shooting. (Vol. V, pg. 61).

Investigator James Fisher, of the Detroit Police Department, testified that he
was the original officer-in-charge for the Defendant's case. (Vol. V, pg. 124).
Inv. Fisher stated that upon being assigned to the case, he became focused
on a vehicle which had taken the decedent to the hospital, and which he later
determined was driven by Mr. Johnson. (Vol. V, pgs. 124-125). Inv. Fisher
indicated that prior to his being transferred out of the homicide division, an
open warrant was issued for the Defendant, but that he was not found until
after Inv. Fisher had been taken off the case. (Vol. V, pgs. 127-128). On
cross examination, Inv. Fisher admitted that it was only through Mr. Johnson
that the Defendant became a suspect in the murder of the decedent. (Vol.
V, pgs. 128-129).

Sergeant William Anderson, of the Detroit Police Department, testified that
he took over from Inv. Fisher as the officer-in-charge for this case, and is
acting in the same capacity for the shooting deaths of Mr. Tolliver and Ms.
White. (Vol. V, pgs. 130-131). Sgt. Anderson indicated that the Defendant
was arrested on July 18, 2007, following an open warrant for his arrest,
which had been issued in March of 2006. (Vol. V, pg. 132).

A stipulation was made that on March 5, 2006 the Defendant had previously
been convicted of a felony and was not eligible to carry or to use a firearm
on that date. (Vol. V, pg. 135)....

Ms. Shamika Turner, the Defendant's fiancee and mother to his children,
testified that in 2005, Mr. Tolliver had lived with her and the Defendant. (Vol.
V, pg. 144). Ms. Turner further indicated that on June 27, 2007, between
8:00 AM and 9:00 AM, she received a phone call from one of the

Defendant's relatives, which caused her to call the Defendant at Ms. Yolanda Moore's home, where she knew the Defendant to be. (Vol. V, pgs. 145-146).

Ms. Kristin Montgomery, a lawyer in defense counsel's office, testified that she was asked to get parole records of Mr. Andre Johnson, according to the Freedom of Information Act, from the Ryan Correctional Facility. (Vol. VI, pg. 21). Ms. Montgomery indicated that she drove out to the Ryan Correctional Facility and spoke with a Mr. Frank Kanisky, who is the Legal Administrator for the Ryan Correctional Facility. (Vol. VI, pg. 22). Ms. Montgomery stated that she requested the Parole Records of Mr. Johnson from Mr. Kanisky and that he provided to her, from his computer, Mr. Andre Elexis Johnson's parole record. (Vol. VI, pg. 24). This Parole Record was then admitted into evidence by the court. (Vol. VI, pg. 24).

Ms. Yolanda Moore testified that June 27, 2007, she had seen the Defendant in her home, along with several other people, including Mr. Steven Anderson and her daughter. (Vol. VI, pgs. 26-27). Ms. Moore indicated that at about 12 or 1 AM, she was awaken by people in her house, and went into the bedroom next to hers to ask them to keep their voices down, and that the Defendant was one of the people in the room at that time. (Vol. VI, pg. 28). She further testified that when she woke up the next morning, she observed the Defendant asleep on the floor of her home, along with several other people who had spent the night. (Vol. VI, pgs. 30-31).

Mr. Corey Dotson testified that he was living in the Brewster Projects around March 5, 2006. (Vol. VI, pg. 38). Mr. Dotson testified that on that date, at around 6:15 PM, he was engaged in a five (5) to ten (10) minute conversation with Mr. Johnson in an area about fifteen (15) to twenty (20) feet away from where anyone else was standing. (Vol. VI, pgs. 39-41). Mr. Dotson indicated that both his and Mr. Johnson's backs were to everyone there, including the decedent, when he heard a gunshot. (Vol. VI, pg. 41). Upon hearing the gunshot, Mr. Dotson observed Mr. Johnson run to his car, never looking back to see what had occurred. (Vol. VI, pg. 43). Mr. Dotson indicated that following the gunshot, he ran to his house, passing the decedent along the way. (Vol. VI, pg. 44). Moreover, Mr. Dotson testified that he did not see the Defendant when he heard the gunshot. (Vol. VI, pg. 54).

Petition, pp. 19-28 (Footnote 1 added and original footnotes omitted).

At the close of trial, the jury found Petitioner guilty of the second-degree murder, felon in possession of a firearm, and felony firearm. The trial court subsequently sentenced him to the terms of imprisonment previously set forth.

7

Following his convictions and sentencing, Petitioner filed an appeal of right with the Michigan Court of Appeals essentially raising the same claims presented on habeas review. The court denied relief on those claims and affirmed his convictions. People v. Pippen, No. 286325, 2000 WL 3837419 (Mich. Ct. App. Nov. 17, 2009) (unpublished). The court also denied reconsideration. Petitioner then filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order. People v. Pippen, 486 Mich. 1046, 783 N.W.2d 380 (2010).

Petitioner, through counsel, thereafter instituted this federal habeas action. He raises the following claims:

I.      The trial court was in error when it ruled that evidence of separate crimes for which [Petitioner] was never charged came in as evidence, as the information was unfairly prejudicial and denied [Petitioner] his due process rights to a fair trial pursuant to US Const, Ams VI, XIV; Const 1963, Art 1, § 17.

II.     [Petitioner] was denied a fair trial where Corey Dotson, a defense witness, was required to appear before the jury in prison clothing, despite [Petitioner's] request that he be permitted to wear civilian clothing provided by defense counsel pursuant to US Const, Ams V, XIV; Mich Const 1963, Art 1, § 17.

III.    The repeated acts of prosecutorial misconduct throughout the trial denied [Petitioner] his due process rights to a fair trial, requiring reversal of his convictions pursuant to US Const, Ams V, XIV; Const 1963, Art 1, Am. 17.

IV.    The great weight of the evidence presented by the prosecutor was insufficient to establish beyond a reasonable doubt that [Petitioner] was guilty of the crimes for which he was charged and convicted pursuant to US Const, Ams V, VI, XIV; Const 1963, Art 1, § 17, 20.

Respondent has filed an answer to the petition contending that it should be denied.

## III.   **Standard of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified 28

8

U.S.C. § 2241 et seq., provides the standard of review for federal habeas cases brought by state prisoners.  The AEDPA provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

 "A state court's decision is 'contrary to' ... clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)); Bell v. Cone, 535 U.S. 685, 694 (2002).  "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quoting Williams, 529 U.S. at 413); Bell, 535 U.S. at 694.  However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" Wiggins, 539 U.S. at 520-

21 (citations omitted).   The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'"   Renico v. Lett, 559 U.S. 766, 773 (2010) (quoting Lindh, 521 U.S. at 333, n. 7); Woodford v. Viscotti, 537 U.S. 19, 24 (2002) (per curiam)).

The Supreme Court has held that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, _ U.S. _, 131 S. Ct. 770, 786 (2011) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  The Supreme Court emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)).  Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court.  Id. Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id.

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. Williams, 529 U.S. at 412; see also Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an

10

unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court" and quoting Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (per curiam).  Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  Harrington, 131 S. Ct. at 785.  Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8 (2002).  While the requirements of "clearly established law" are to be determined solely by Supreme Court precedent, the decisions of lower federal courts may be useful in assessing the reasonableness of the state court's resolution of an issue.  See Stewart v. Erwin, 503 F.3d 488, 493 (6th Cir. 2007) (citing Williams v. Bowersox, 340 F.3d 667, 671 (8th Cir. 2003)); Dickens v. Jones, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

A state court's factual determinations are presumed correct on federal habeas review.  28 U.S.C. § 2254(e)(1).  A habeas petitioner may rebut this presumption only with clear and convincing evidence.  Warren v. Smith, 161 F.3d 358, 360-61 (6th Cir. 1998).  Moreover, habeas review is "limited to the record that was before the state court."  Cullen v. Pinholster, _ U.S. _, 131 S. Ct. 1388, 1398 (2011).

**IV.**    **Analysis**

**A.**    **Evidentiary Claim**

Petitioner asserts that he is entitled to habeas relief because the trial court erred in admitting evidence regarding the 2007 murders of Capri Tolliver and Lakeshia White.

11

Petitioner alleges violations of the Michigan Rules of Evidence and his due process rights, particularly since he was not charged with committing those crimes. Respondent contends that this claim lacks merit.

The Michigan Court of Appeals denied relief on this claim finding that the evidence was properly admitted under the Michigan Rules of Evidence and the trial court did not abuse its discretion. The court explained:

> Defendant first claims that statements made by him, and overheard by James Thomas, Jr., about "taking care" of or "knocking off" White were not admissible under MRE 801(d)(2)(A). Under MRE 801(d)(2), a statement is not hearsay if "[t]he statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity...." *See also People v. Kowalak*, 215 Mich. App. 554, 556–557, 546 N.W.2d 681 (1996) (the defendant's alleged threat to his mother that he was going to kill her for what she had done in court proceedings was admissible under MRE 801(d)(2)(A)). Here, defendant's statements of wanting to "take care" of or "knock off" White met the requirements of MRE 801(d)(2)(A)). Defendant made the statements, and the statements were offered against defendant. Accordingly, the statements were admissible under MRE 801(d)(2)(A).
>
> Second, defendant claims that White's out-of-court statements threatening to inform the police of his whereabouts were inadmissible under MRE 804(b)(6) because there was no evidence that he orchestrated the murders of White and Tolliver. MRE 804(b)(6) provides that a declarant's out-of-court statements are admissible if the declarant is unavailable as a witness and the "statement [is] offered against a party that has engaged in or encouraged wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Before admitting a statement under MRE 804(b)(6), the trial court must find by a preponderance of the evidence that the party was responsible for the declarant's unavailability. *People v. Jones*, 270 Mich. App. 208, 215–217, 714 N.W.2d 362 (2006).
>
> Sara Steiger testified that when she and White returned to their house in the early morning hours of June 27, 2007, defendant was at the house with Tolliver, his cousin and White's boyfriend. Defendant went outside to the front porch several times. According to Steiger, soon after defendant retuned from the porch for the last time, another man entered the house, and this man shot Tolliver, White, and Steiger. Defendant did not render any aid to Tolliver. After Steiger ran from the house, she saw defendant and the

12

other man leave the house and run down the street together. Steiger's testimony, along with Thomas's testimony that defendant declared that White needed to be "taken care" of, provided an inference that defendant "encouraged" the shooting of White. Accordingly, the trial court did not abuse its discretion in finding by a preponderance of the evidence that defendant was involved in White's death. White's statements were admissible under MRE 804(b)(6).

Third, defendant claims that all the evidence relating to the murders of White and Tolliver, including his out-of-court statements and the statements of White, was inadmissible under MRE 403.[FN1] MRE 403 provides that evidence, although relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." "All relevant evidence will be damaging to some extent. The fact that evidence is prejudicial does not make its admission unfair." *People v. Murphy* (On Remand), 282 Mich. App. 571, 582–583, 766 N.W.2d 303 (2009) (internal citation omitted). "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v. Ortiz*, 249 Mich. App. 297, 306, 642 N.W.2d 417 (2001) (quotation omitted). Here, the risk of unfair prejudice did not substantially outweigh the probative force of the evidence of the White and Tolliver murders. White, who had been told that defendant shot Hill, threatened to inform the police of defendant's whereabouts. Defendant then declared that White needed to be "taken care" of. This evidence, along with Steiger's testimony of the killings of White and Tolliver, was highly probative regarding whether defendant was, in fact, the person who shot Hill. Accordingly, the trial court did not abuse its discretion in concluding that the evidence relating to the White and Tolliver murders was not unfairly prejudicial.[FN2]

FN1. The trial court admitted the evidence relating to the murders of White and Tolliver as evidence of an "admission by conduct." Defendant does not challenge this holding of the trial court on appeal.

FN2. We note that the trial court provided the jury with a limiting instruction regarding the proper use of the evidence of the murders of White and Tolliver.

Pippen, 2009 WL 3837419 at *1-2.

The state court's decision is neither contrary to Supreme Court precedent nor an

unreasonable application of federal law or the facts.[2]   Alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief.  See Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); Serra v. Michigan Dep't of Corrections, 4 F.3d 1348, 1354 (6th Cir. 1993). "Trial court errors in state procedure or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action, unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment."  McAdoo v. Elo, 365 F.3d 487, 494 (6th Cir. 2004) (quoting McGuire, 502 U.S. at 69-70); see also Wynne v. Renico, 606 F.3d 867, 871 (6th Cir. 2010) (citing Bey v. Bagley, 500 F.3d 514, 519-20 (6th Cir. 2007)); Bugh v. Mitchell, 329 F.3d 496, 512 (6th Cir. 2003).

Accordingly, to the extent that Petitioner asserts that the trial court erred in admitting the disputed testimony under the Michigan Rules of Evidence, he merely alleges a state law violation which does not entitle him to federal habeas relief.  See, e.g., Beach v. Moore, 343 F. App'x 7, 11 (6th Cir. 2009) (ruling that nothing in the text of Federal Rule of Evidence 410 or its Ohio counterpart refers to a constitutional right).  State courts are the final arbiters of state law and the federal courts will not intervene in such matters. Lewis v. Jeffers, 497 U.S. 764, 780 (1990); see also Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Sanford v. Yukins, 288 F.3d 855, 860 (6th Cir. 2002).

---

[2]To the extent that it could be argued that the Michigan Court of Appeals did not address the federal nature of Petitioner's evidentiary claim, the Court notes that it would reach the same result under a de novo standard of review.

Petitioner has also not established that the admission of the disputed evidence violated his due process rights. James Thomas' testimony recalling Petitioner's statement to Capri Tolliver about "taking care of Lakeshia White" was properly admitted as a party admission under Michigan Rule of Evidence 801(d)(2)(A). Petitioner has not shown that the admission of such evidence was erroneous, let alone fundamentally unfair.

James Thomas' testimony recalling White's out-of-court statement that she had threatened to inform the police of Petitioner's whereabouts was properly admitted under Michigan Rule of Evidence 804(b)(6) because Sara Steiger's testimony established by a preponderance of the evidence that Petitioner was involved in White's death, thereby allowing White's out-of-court statement to be admitted since Petitioner was responsible for her unavailability at trial. Moreover, contrary to Petitioner's assertion, the admission of White's statement did not violate his confrontation rights. In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court held that the testimonial statement of a witness who does not appear at trial is inadmissible unless the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. Testimonial statements include preliminary hearing testimony, grand jury testimony, prior trial testimony, and statements made during police interrogations. Id. at 54. Testimonial statements do not include remarks made to family members or acquaintances, business records, or statements made in furtherance of a conspiracy. Id. at 51-52, 56; United States v. Martinez, 430 F.3d 317, 328-29 (6th Cir. 2005); see also United States v. Stover, 474 F.3d 904, 912-13 (6th Cir. 2007). Lakeshia's statements were made to

acquaintances and were non-testimonial.  Crawford is thus inapplicable.[3]

Moreover, the Supreme Court has made clear that the Confrontation Clause is not implicated, and need not be considered, when non-testimonial hearsay is at issue.  Davis v. Washington, 547 U.S. 813, 823-24 (2006); see also Whorton v. Bockting, 549 U.S. 406, 420 (2007) (noting that the Confrontation Clause "has no application to such statements and therefore permits their admission even if they lack indicia of reliability"); Doan v. Carter, 548 U.S. 449, 458 (6th Cir. 2008); United States v. Arnold, 486 F.3d 177, 192-93 (6th Cir. 2007) (en banc).  Such is the case here.  Petitioner has not shown that the admission of the testimony violated his confrontation rights or otherwise rendered his trial fundamentally unfair.

Lastly, the admission of the evidence relating to the other murders was also appropriate under Michigan Rule of Evidence 403 because Petitioner's possible involvement in the deaths of White and Tolliver was highly relevant and probative as to whether Petitioner shot the victim.  While such evidence was prejudicial to Petitioner, it was not unfairly prejudicial.  Moreover, the Court notes that the potential risk of unfair prejudice was mitigated by the fact that the trial court instructed the jury on the proper consideration of the evidence.  Jurors are presumed to follow a court's instructions.  See Penry v. Johnson, 532 U.S. 782, 799 (2001) (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)); United States v. Powell, 469 U.S. 57, 66 (1984) ("Jurors . . . take an oath to follow the law as charged, and they are expected to follow it.").  Petitioner has failed to

---

[3]The Supreme Court has also confirmed that the rule of forfeiture by wrongdoing, i.e., a defendant may not benefit from his wrongful prevention of a witness's future testimony, extinguishes confrontation claims on equitable grounds.  Crawford, 541 U.S. at 62; see also Giles v. California, 554 U.S. 353, 367 (2008).

establish that the admission of the disputed evidence was erroneous or, more importantly for purposes of habeas review, that it rendered his trial fundamentally unfair.  Habeas relief is not warranted on this claim.

**B.**    **Witness in Prison Garb Claim**

Petitioner also asserts that he is entitled to habeas relief because the trial court required a defense witness, Corey Dotson, to appear in prison garb at trial despite the defense request that he be allowed to change into civilian clothes.  Respondent contends that this claim lacks merit.

The Michigan Court of Appeals denied relief on this claim, noting the lack of legal authority supporting Petitioner's argument.  The court explained in relevant part:

> A defendant can be denied due process by being compelled to go to trial wearing prison clothes. *People v. Lee*, 133 Mich. App. 299, 300–301, 349 N.W.2d 164 (1984). The United States Supreme Court has noted that forcing a defendant to wear prison clothing violates his presumption of innocence to the jury and violates equal protection by stigmatizing those who cannot afford to post bail. *Estelle v. Williams*, 425 U.S. 501, 504–506, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976). None of these factors apply when a defense witness, other than a defendant, testifies. *See Banks, supra* at 259, 642 N.W.2d 351 (handcuffing or shackling of a defense witness does not affect a defendant's presumption of innocence). A witness has no presumption of innocence, and bail is not an issue for someone who is serving a prison sentence. Before the lower court and here on appeal, defendant has not cited a single authority in support of his position. Given this lack of authority, the trial court did not abuse its discretion in denying defendant's motion to allow Dotson to wear civilian clothing while testifying.

Pippen, 2009 WL 3837419 at *2.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof.  Due process precludes a defendant from being compelled to stand trial in jail or prison garb as long as the defendant makes a timely objection/request.  Estelle v. Williams, 425 U.S. 501, 512 (1976).  Compelling a defendant

17

appear in prison garb impairs the presumption of innocence guaranteed under the Fourteenth Amendment because it presents the unacceptable risk of affecting a juror's judgment and furthers no essential state policy. Id. at 503-05. It is only a state's compulsion that is prohibited and not the wearing of prison garb in general because defendants sometimes use prison garb as a tactic to elicit sympathy from the jury. Id. at 508. Due process similarly precludes the use of visible physical restraints upon a defendant "absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." Deck v. Missouri, 544 U.S. 622, 629 (2005) (citing cases).

The Supreme Court, however, has never ruled that the prohibition on compelling a defendant to wear prison garb or appear in shackles applies to witnesses. Moreover, an extension of the prohibition does not inevitably follow from the reasoning of the aforementioned Supreme Court decisions. In Estelle and Deck, the Supreme Court reasoned that the principal interest protected by the Due Process Clause is the presumption of innocence accorded criminal defendants, a presumption that is undercut when the defendant appears before jurors wearing prison garb or shackles. Estelle, 425 U.S. at 503; Deck, 544 U.S. at 630. That presumption is inapplicable to witnesses in that defendants are not entitled to a presumption that their witnesses are innocent – and a convicted witness is not entitled to such a presumption. Simply put, the Supreme Court has never held that the Constitution prohibits a witness from being compelled to testify in prison garb or visible restraints. See Pratt v. Davis, No. 07-CV-15112, 2009 WL 2766725, *8 (E.D. Mich. Aug. 26, 2009) (denying habeas relief on similar claim due to lack of Supreme Court precedent); Torrez v. McKee, 601 F. Supp. 2d 920, 949 (W.D. Mich. 2009)

18

(same); accord Saenz v. Marshall, 990 F.2d 1260, 1993 WL 98806, *1 (9th Cir. 1993) (unpublished).  Accordingly, the Michigan Court of Appeals' denial of relief on this claim is neither contrary to nor an unreasonable application of Supreme Court precedent.

Moreover, even if Dotson's appearance before the jury in prison garb rose to the level of a constitutional violation, such error was harmless.  For purposes of federal habeas review, a constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993): see also Fry v. Pliler, 551 U.S. 112, 117–18 (2007) (confirming that the Brecht standard applies in "virtually all" habeas cases); Ruelas v. Wolfenbarger, 580 F.3d 403, 411 (6th Cir. 2009) (ruling that Brecht is "always the test" in the Sixth Circuit).  Harmless error analysis has been applied to claims involving the use of prison clothing and shackles.  See, e.g., Lakin v. Stine, 431 F.3d 959, 966 (6th Cir. 2005) (citing Supreme Court cases). Dotson's wearing of prison garb did not prejudice Petitioner nor have a substantial effect or influence on the jury's verdict.  Dotson testified that he was a state prisoner and had been convicted of second-degree murder.  "No prejudice can result from seeing that which is already known." United States ex rel. Stahl v. Henderson, 472 F.2d 556, 557 (5th Cir. 1973); see also United States v. Brooks, 125 F.3d 484, 499 (7th Cir. 1997) (witness's testimony about her convictions and prisoner status dispelled any prejudice arising from her prison garb); United States v. Adams, 1 F.3d 1566, 1584 (11th Cir. 1993) (citing cases and finding no prejudicial error arising from co-defendants testifying in prison clothes).  Additionally, the jury was well aware of Dotson's relationships with Petitioner and prosecution witness Andre Johnson (who also appeared in prison garb), and other factors affecting his

19

credibility.  Any error in having Dotson appear in prison garb was harmless.  Habeas relief is not warranted on this claim.

### C.        **Prosecutorial Misconduct Claims**

Petitioner next asserts that he is entitled to habeas relief because the prosecutor engaged in misconduct by arguing facts not in evidence and by placing the prestige of her office before the jury to discredit defense witness Corey Dotson.  Respondent contends that these claims are barred by procedural default and lacks merit.

Federal habeas relief may be precluded on a claim that a petitioner has not presented to the state courts in accordance with the state's procedural rules.  Wainwright v. Sykes, 433 U.S. 72, 85-87 (1977); Couch v. Jabe, 951 F.2d 94, 96 (6th Cir. 1991).  The doctrine of procedural default applies when a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent."  White v. Mitchell, 431 F.3d 517, 524 (6th Cir. 2006); Howard v. Bouchard, 405 F.3d 459, 477 (6th Cir. 2005); Coleman v. Mitchell, 244 F.3d 533, 539 (6th Cir. 2001).  "A procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar."  Harris v. Reed, 489 U.S. 255, 263-64 (1989).  The last explained state court ruling is used to make this determination.  Ylst v. Nunnemaker, 501 U.S. 797, 803-05 (1991).

The Michigan Court of Appeals rendered the last reasoned opinion on these claims.  In denying relief, the court relied upon the failure to object at trial.  Pippen, 2009 WL 3837419 at *3.  The failure to make a contemporaneous objection is a recognized and firmly-established independent and adequate state law ground for refusing to review trial

errors. People v. Carines, 460 Mich. 750, 763, 597 N.W.2d 130, 138 (1999); People v. Stanaway, 446 Mich. 643, 687, 521 N.W.2d 557, 579 (1994); see also Coleman v. Thompson, 501 U.S. 722, 750-51 (1991). Moreover, a state court does not waive a procedural default by looking beyond the default to determine if there are circumstances warranting review on the merits. Paprocki v. Foltz, 869 F.2d 281, 285 (6th Cir. 1989). Plain error review does not constitute a waiver of state procedural default rules. Girts v. Yanai, 501 F.3d 743, 755 (6th Cir. 2007); Hinkle v. Randle, 271 F.3d 239, 244 (6th Cir. 2001); Seymour v. Walker, 224 F.3d 542, 557 (6th Cir. 2000). Nor does a state court fail to sufficiently rely upon a procedural default by ruling on the merits in the alternative. McBee v. Abramajtys, 929 F.2d 264, 267 (6th Cir. 1991). The Michigan Court of Appeals denied relief on these claims based upon a procedural default – the failure to properly object at trial.

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. Coleman, 501 U.S. at 753; Gravley v. Mills, 87 F.3d 779, 784-85 (6th Cir. 1996). To establish cause, a petitioner must establish that some external impediment frustrated his or her ability to comply with the state's procedural rule. Murray v. Carrier, 477 U.S. 478, 488 (1986). A petitioner must present a substantial reason to excuse the default. Amadeo v. Zant, 486 U.S. 214, 223 (1988). Such reasons include interference by officials, attorney error rising to the level of ineffective assistance of counsel, or a showing that the factual or legal basis for a claim was not reasonably available. McCleskey v. Zant, 499 U.S. 467, 493-94 (1991).

21

In this case, Petitioner neither alleges nor establishes cause to excuse this procedural default.  The Court need not address the issue of prejudice when a petitioner fails to establish cause to excuse a procedural default.  Smith v. Murray, 477 U.S. 527, 533 (1986); Long v. McKeen, 722 F.2d 286, 289 (6th Cir.1983).  Nonetheless, the Court notes that even if Petitioner could establish cause, he cannot establish actual prejudice as the claims lack merit.  As explained by the Michigan Court of Appeals on plain error review, the prosecutor's comment that "people were murdered" was supported by the evidence presented at trial and the prosecutor's questions about her office prosecuting Dotson were intended to reveal potential bias.  Petitioner has not shown that the prosecutor's conduct was improper, let alone that it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); see also Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citing Donnelly); Parker v. Matthews, _ U.S. _, 132 S. Ct. 2148, 2153 (2012) (confirming that Donnelly/Darden is the proper standard).

Petitioner also fails to demonstrate that a fundamental miscarriage of justice occurred.  The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent.  Murray v. Carrier, 477 U.S. 478, 479-80 (1986).  To be credible, such a claim requires a petitioner to provide new, reliable evidence that was not presented at trial.  Schlup v. Delo, 513 U.S. 298, 324 (1995).  Moreover, actual innocence means factual innocence, not mere legal insufficiency.  Bousley v. United States, 523 U.S. 614, 623 (1998).  Petitioner makes no such showing.  These claims are thus barred by procedural default, lack merit, and do not warrant habeas relief.

**D.     Insufficient Evidence Claim**

Lastly, Petitioner asserts that he is entitled to habeas relief because the prosecution failed to present sufficient evidence to support his convictions.  In particular, he claims that the prosecution failed to establish that he caused the victim's death and acted with malice.  Respondent contends that this claim lacks merit.

The federal due process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  The question on a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  A federal habeas court views this standard through the framework of 28 U.S.C. § 2254(d).  Martin v. Mitchell, 280 F.3d 594, 617 (6th Cir. 2002).  Thus, under the AEDPA, challenges to the sufficiency of the evidence "must survive two layers of deference to groups who might view facts differently" than a reviewing court on habeas review – the factfinder at trial and the state court on appellate review – as long as those determinations are reasonable.  Brown v. Konteh, 567 F.3d 191, 205 (6th Cir. 2009).  Furthermore, the Jackson standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law."  Brown v. Palmer, 441 F.3d 347, 351 (6th Cir. 2006) (quoting Jackson, 443 U.S. at 324 n. 16).  "A reviewing court does not re-weigh the evidence or re-determine the credibility of the witnesses whose demeanor has been observed by the trial court."  Matthews v. Abramajtys, 319 F.3d 780, 788 (6th Cir. 2003) (citing Marshall v. Lonberger, 459 U.S. 422, 434 (1983)).

23

Accordingly, the "mere existence of sufficient evidence to convict . . . defeats a petitioner's claim." Matthews, 319 F.3d at 788-89.

Under Michigan law, the elements of second-degree murder are:  (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. MICH. COMP. LAWS § 750.317;  People v. Goecke, 457 Mich. 442, 463-64, 579 N.W.2d 868, 878 (1998) (citing People v. Bailey, 451 Mich. 657, 669, 549 N.W.2d 325, 331 (1996)).  Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to perform an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm.  Id. at 464 (citing People v. Aaron, 409 Mich. 672, 728, 299 N.W.2d 304, 326 (1980)).  Malice may be inferred from evidence that a defendant intentionally set in motion a force likely to cause death or great bodily harm.  People v. Djordjevic, 230 Mich. App. 459, 463, 584 N.W.2d 610, 612 (1998) (citing Aaron).  Malice may also be inferred from the use of a deadly weapon.  Carines, 460 Mich. at 759, 597 N.W.2d at 136.

The elements of felon in possession of a firearm are:  (1) the defendant was convicted of a felony, (2) the defendant possessed a firearm, and (3) at the time of possession less than three or five years, depending on the underlying felony, has passed since the defendant completed his term of incarceration, satisfied all conditions of probation and parole, and paid all fines.  MICH. COMP. LAWS § 750.224f; People v. Perkins, 473 Mich. 626, 629-31, 703 N.W.2d 448, 450-51 (2005).  The elements of felony firearm are that the defendant possessed a firearm during the commission of, or an attempt to commit, a felony offense.  MICH. COMP. LAWS § 750.227b; People v. Akins, 259 Mich. App. 545, 554, 675 N.W.2d 863, 873 (2003) (quoting People v. Avant, 235 Mich. App. 499,

24

505, 597 N.W.2d 864, 869 (1999)).

Direct or circumstantial evidence and reasonable inferences drawn therefrom may be sufficient to prove the elements of a crime, People v. Jolly, 442 Mich. 458, 466, 502 N.W.2d 177, 180 (1993), including identity. People v. Johnson, 146 Mich. App. 429, 434, 381 N.W.2d 740, 742 (1985), and the defendant's intent or state of mind. People v. Dumas, 454 Mich. 390, 398, 563 N.W.2d 31, 34 (1997).

Applying the Jackson standard, the Michigan Court of Appeals found that the prosecution presented sufficient evidence to support Petitioner's convictions and denied relief on this claim. The court explained in relevant part:

> Andre Johnson testified[FN3] that on March 5, 2006, he and Hill were outside Brewster Projects. Johnson's back was toward Hill, but he turned around and saw Hill talking with defendant and Anderson. There was testimony that defendant and Anderson had "problems" with Hill. Johnson did not see anybody other than defendant and Anderson in the immediate vicinity of Hill. A few minutes later, Johnson heard a gunshot. He looked to where Hill had been standing, and he saw Hill on the ground. He saw defendant with a black handgun in his hand running away. Johnson did not see anybody else with a gun. In addition, there was evidence that defendant "encouraged" the killing of White and Tolliver because White threatened to inform the police of defendant's whereabouts. Viewing this evidence in the light most favorable to the prosecution, a rational trier of fact could conclude beyond a reasonable doubt that defendant was the person who shot Hill and that defendant shot Hill with malice. Defendant's conviction for second-degree murder is supported by sufficient evidence.
>
> FN3. Johnson testified at trial that he could not remember the events of March 5, 2006, with any absolute certainty. His testimony from defendant's preliminary examination was read into the record, and the trial court instructed the jury that it was to consider this testimony as it considered testimony given at trial.

Pippen, 2009 WL 3837419 at *4.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The prosecution presented sufficient

25

evidence to establish Petitioner's guilt of second-degree murder, felon in possession, and felony firearm through the testimony of Andre Johnson, the evidence indicating that Petitioner sought to evade the police and was involved in the killing of potential trial witnesses, and the stipulation that Petitioner was a prior felon.  Considered in a light favorable to the prosecution, such evidence was sufficient to show that Petitioner was a felon who possessed a firearm, that he used that firearm to shoot the victim in the head, and that he acted with the requisite malice to support his second-degree murder conviction.

Petitioner challenges the credibility of the prosecution's witnesses, the jury's evaluation of the evidence, and the lack of physical evidence linking him to the shooting. However, it is the job of the fact-finder at trial, not a federal habeas court, to resolve evidentiary conflicts.  Jackson, 443 U.S. at 326; Martin v. Mitchell, 280 F.3d 594, 618 (6th Cir. 2002); see also Walker v. Engle, 703 F.2d 959, 969-70 (6th Cir. 1983) ("A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.").  The jury's verdict, and the Michigan Court of Appeals' decision affirming that verdict, were reasonable.  The evidence presented at trial, viewed in a light favorable to the prosecution, established beyond a reasonable doubt that Petitioner committed the crimes of which he was convicted.  Habeas relief is not warranted on this claim.

**V.   Conclusion**

For the reasons stated, the Court concludes that Petitioner is not entitled to federal

habeas relief on the claims contained his petition.  Accordingly, the Court **DENIES** and **DISMISSES** with prejudice the petition for a writ of habeas corpus.

Before Petitioner may appeal the Court's decision, a certificate of appealability must issue.  See 28 U.S.C. § 2253(c)(1)(a); FED. R. APP. P. 22(b).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When a district court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong. Slack v. McDaniel, 529 U.S. 473, 484-85 (2000).  "A petitioner satisfies this standard by demonstrating that ... jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).  In applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merits.  Id. at 336-37.  When a district court denies relief on procedural grounds without addressing the merits, a certificate of appealability should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the court was correct in its procedural ruling.  Slack, 528 U.S. at 484-85.

Having conducted the requisite review, the Court concludes that Petitioner has not made a substantial showing of the denial of a constitutional right as to any of his habeas claims and that reasonable jurists could not debate the correctness of the Court's procedural ruling as to his prosecutorial misconduct claim.  Accordingly, the Court

27

**DENIES** a certificate of appealability.  The Court also **DENIES** leave to proceed in forma

pauperis on appeal because an appeal cannot be taken in good faith.  See FED. R. APP.

P. 24(a).  This case is closed.

      **IT IS SO ORDERED**.


                        s/Marianne O. Battani
                        MARIANNE O. BATTANI
                        UNITED STATES DISTRICT JUDGE

Dated:  April 4, 2014

CERTIFICATE OF SERVICE

     I hereby certify that on the above date a copy of this Opinion and Order was served upon the Petitioner via ordinary U.S. Mail, and Counsel for the Respondent, electronically.

                        s/Bernadette M. Thebolt
                        Case Manager